UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| LINDA M. MUCKLER, | ) | CIV. 08-5005 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INTRODUCTION

This appeal from the Social Security Administration's denial of

Linda Muckler's application for disability benefits presents the narrow question

of whether Ms. Muckler met the definition of "disabled" for the four-day period

from December 27, 1990, to December 31, 1990. After a long and tortuous

procedural history, Ms. Muckler maintains that the administrative record

("A.R.") from the agency demonstrates that she is entitled to disability benefits.

Defendant the Commissioner of the Social Security Administration opposes

Ms. Muckler's complaint and seeks an order of the court affirming the agency's

decision to deny benefits. The district court, the Honorable Karen E. Schreier,

Chief Judge, referred this matter to this magistrate judge for a report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

Ms. Muckler's administrative record comprises some 1,300 pages of documents and transcripts detailing three separate applications for disability benefits by Ms. Muckler dating back to October 31, 1990, and asserting a disability said to have arisen on November 21, 1985. Three different administrative law judges ("ALJ"s) have held four different evidentiary hearings and issued three separate written opinions denying benefits. Ms. Muckler raises four issues with regard to the last decision made by the last ALJ to pass judgment on her case:

1.    The ALJ erred in deciding that Ms. Muckler's depression was a non-severe impairment

2.    The ALJ erred in failing to even mention Dr. Sabow's opinion as to Muckler's ability to work

3.    The ALJ erred in rejecting Dr. Anderson's opinion that Ms. Muckler was not capable of performing work eight hours a day due to her psychological and physical conditions.

4.    The ALJ erred in discrediting Ms. Muckler's testimony.

Ms. Muckler's first application for disability benefits was denied and the decision became final on December 27, 1990. No appeal was ever taken from that denial. Because of that, the agency's determination that Ms. Muckler was not disabled before December 27, 1990, is conclusive, a fact that Ms. Muckler does not contest.

Ms. Muckler's insured status for purposes of disability benefits ceased on December 31, 1990, also a fact uncontested by Ms. Muckler. Thus, although

literally decades of Ms. Muckler's medical documents fill the A.R., the court

discusses only those documents shedding light on her condition in late

December, 1990, unless discussion of other documents is necessary to explain

or give context.

## PROCEDURAL HISTORY

As stated above, Ms. Muckler's first application for Title II disability

benefits was made on October 31, 1990, and denied on December 27, 1990.

No appeal was taken. Ms. Muckler made a second application benefits on

October 26, 1993, which was denied on November 9, 1993. Again, no appeal

was taken.[1]

A third application for benefits was made on April 17, 1996, and was

denied initially and denied again on reconsideration. Ms. Muckler requested

and received a hearing before ALJ Paul Conaway on September 25, 1997. ALJ

Conaway issued a written decision after the hearing consolidating

Ms. Muckler's second and third application for benefits and finding that

Ms. Muckler was not disabled for the period from December 27-31, 1990. An

appeal to United States District Court was filed. Thereafter, the court granted

the agency's unopposed request to remand the matter for further

---

[1]Although Ms. Muckler did not appeal the denial of her second application for benefits, it was later determined that she had established good cause for not doing so. A.R. 18.

administrative proceedings.  See Muckler v. Apfel, Civ. 99-5056-RHB, Docket

Nos. 18, 19 (D.S.D. Feb. 15, 2000).

On remand, two evidentiary hearings were held before ALJ

James W. Olson on August 17, 2000, and December 7, 2001.  ALJ Olson

issued a written decision denying benefits on February 20, 2002.  The agency

Appeals Council reviewed ALJ Olson's decision and remanded the matter for

further proceedings.

On remand, a fourth evidentiary hearing was held before ALJ

Larry M. Donovan on April 20, 2006.  ALJ Donovan issued a written decision

denying disability benefits to Ms. Muckler on June 15, 2006.  The Appeals

Council declined jurisdiction on January 9, 2008.  This appeal timely followed.

Thus, the decision of ALJ Donovan is the final agency action for purposes of

this appeal.

## FACTS

**A.      Medical Evidence in the Record**

Ms. Muckler injured her left wrist while lifting a patient in her job as a

nurse's aid in November, 1985.  Thereafter, she developed continuing

symptoms and pain affecting her left upper extremity and received treatment

and evaluations from various care providers as further detailed in the records

discussed below.

**1.    Dr. J.D. Sabow, M.D.**

Dr. J.D. Sabow first saw Ms. Muckler in connection with her left wrist on December 11, 1985, and continued treating her on and off through 1994.  A.R. 139-144, 321-331, and 915.  Initially, he diagnosed a wrist sprain and recommended a wrist splint.  A.R. 139.  When Ms. Muckler's wrist pain did not abate, Dr. Sabow eventually concluded that she was suffering from reflex sympathetic dystrophy and referred her to Dr. Dale Anderson.  A.R. 140.

In July, 1986, Dr. Sabow re-evaluated Ms. Muckler and diagnosed her as suffering from thoracic outlet syndrome in addition to the reflex sympathetic dystrophy.  A.R. 141.  In March, 1987, Dr. Sabow expressed a desire for Ms. Muckler to get an opinion from a thoracic surgeon in Denver, Colorado, regarding her status.  Id.

Dr. Sabow performed nerve conduction studies on Ms. Muckler on March 5, 1986; on July 29, 1986; on May 13, 1987; and on March 31, 1991.  A.R. 143, 144, 321, 978.  Those studies always showed normal results.  Id.

In August, 1991, Ms. Muckler underwent thoracic outlet surgery, described in more detail below.  Dr. Sabow followed her post-surgery to ensure that her scars healed, that there were no complications, and to monitor her medications.  A.R. 979-981.  By April 29, 1992, Dr. Sabow stated that he was "very impressed" with the improvement in Ms. Muckler's pain and physical condition, describing her as better than he had seen her in years.  Id.  In July,

1992, he estimated that the surgery effected a 70-80% improvement with her arm pain. A.R. 981.

In July, 1992, Dr. Sabow saw Ms. Muckler regarding her complaints as to "common" migraine headaches. Id. Dr. Sabow associated these headaches with withdrawal symptoms that Ms. Muckler was likely experiencing as a result of weaning herself from pain medications. Id. On August 4, 1992, Ms. Muckler reported no improvement in her headaches and Dr. Sabow prescribed the antidepressant Zoloft, since the headaches seemed to have become worse after Ms. Muckler discontinued taking Prozac. Id.

Dr. Sabow saw Ms. Muckler on August 19, 1992, and September 21, 1992, at which time he described her as looking "better than I've ever seen her." A.R. 982. At this time she had discontinued all her pain medications, which Dr. Sabow stated was "ideal" because he felt she had been "slipping back into the habits of chronic chemical dependence." Id. Dr. Sabow recorded in the last quarter of 1992 that Ms. Muckler was exercising with a Nordic Track, more successfully with her lower body than with her upper body, but that he felt she would improve with more time. Id. Dr. Sabow saw Ms. Muckler again on May 27, 1993, and again wrote that she was "the very best I've seen her in years." A.R. 982.

In September, 1993, Ms. Muckler contacted Dr. Sabow's office by telephone, said she was depressed, and asked for a prescription for Prozac.

A.R. 322.  Dr. Sabow issued that prescription on the basis of the phone call

alone.  Id.  Ms. Muckler then apparently came to Dr. Sabow's office in person

on September 28, 1993.  Id.

On September 28, 1993, Ms. Muckler described to Dr. Sabow increased

pain symptoms with her left arm, and now with her right arm due to overuse.

Id.  She indicated that she was currently being evaluated for potential

retraining in some type of employment.  Id.  Dr. Sabow discouraged

Ms. Muckler from enrolling in any further pain clinics (she had gone through

two pain programs by this point, as discussed more fully below) and opined

that her situation was not reversible.  Id.  Dr. Sabow opined that Ms. Muckler

was unemployable and disabled due to chronic pain syndrome.  Id.  Having

rendered this opinion, Ms. Muckler appears not to have seen Dr. Sabow again

as there are no other treatment records from Dr. Sabow in the A.R.  Aside from

this September, 1993, visit, the only other subsequent record from Dr. Sabow

was when he saw Ms. Muckler at her husband's request because of her

hallucinations in January, 1994 (discussed below), at which time Dr. Sabow

stated that he would contact Dr. Manlove for the purpose of getting

Ms. Muckler admitted to a mental hospital.  A.R. 915.

**2.     Dr. Dale Anderson, M.D.**

Dr. Dale Anderson, an orthopaedic surgeon, first saw Ms. Muckler in

March, 1986, and for a period of years thereafter, primarily for her arm, which

he diagnosed as reflex sympathetic dystrophy. A.R. 216, 297-302. On June 8, 1987, after treating Ms. Muckler and being acquainted with her condition for some 15 months, Dr. Anderson opined that Ms. Muckler could work at the sedentary or very light exertional level. A.R. 218.

It was 15 months until Ms. Muckler saw Dr. Anderson again, this time on September 30, 1988. A.R. 219. In the interim, Ms. Muckler had undergone a pain management program with Dr. Dong Cho. Id. Ms. Muckler reported that she was exercising at home, riding a stationary bicycle, using a Theraband, and using arm weights.[2] Dr. Anderson's examination revealed no objective findings of disability, noting that she had normal range of motion, no muscle atrophy, intact color and circulation, and that her reflexes and sensibility were intact. Id. Although Ms. Muckler reported subjective complaints of pain, swelling, and weakness in her left upper extremity, Dr. Anderson characterized these complaints as "moderate in degree." Id. Dr. Anderson opined that she was capable of doing sedentary work given her age and good range of motion. A.R. 220. Ms. Muckler saw Dr. Anderson on February 20, 1989, and again on March 24, 1989, again to similar effect as the September, 1988, visit. A.R. 221.

---

[2]This is confirmed by a separate note dated May 23, 1988, from physical therapist Jim Simons, who recorded that Ms. Muckler was being prescribed wrist weights for home exercises in order to supplement her existing exercise regime of stationary cycling and Theraband exercises. A.R. 285.

Ms. Muckler saw Dr. Anderson again a year later, on March 15, 1990. A.R. 222. Ms. Muckler reported that she was still doing exercises on a daily basis at home as well as riding an exercise bicycle. Id. Ms. Muckler sought additional pain medication from Dr. Anderson, but he instead prescribed a cervical traction kit for her to use 15 minutes a day. Id.

Ms. Muckler next saw Dr. Anderson on August 24, 1990, and for the first time complained to him of "depression and lack of energy." Id. Dr. Anderson's examination of Ms. Muckler's left upper extremity was entirely normal objectively. Id. Dr. Anderson recommended that Ms. Muckler resume her exercises, which she had recently halted, as an antidote to her depression. A.R. 223. He also recommended that she see Dr. Renka again regarding her depression. Id. However, there are no records in the A.R. from Dr. Renka following this August, 1990, referral by Dr. Anderson, so apparently Ms. Muckler did not follow up on Dr. Anderson's recommendation that she see Dr. Renka.

Ms. Muckler saw Dr. Anderson next on October 11, 1990. A.R. 223. She reported to him at that time that she had experienced improvements in her overall outlook and emotional status. Id. She told Dr. Anderson that she had obtained a mountain bike and was riding it on a regular basis. Id. She also reported that she was sleeping better and had "a better outlook on life." Id. She indicated that she still experienced intermittent numbness and tingling in

her left upper extremity, especially when laying on her left side or sleeping with her arm above her head.  Id.  She indicated that these symptoms resided rapidly if she changed the position of her arm or rubbed the arm.  Id.  Dr. Anderson opined that she could return to a light duty job.  Id.

Dr. Anderson filled some prescriptions for Ms. Muckler in December, 1990, and January and February, 1991, for Darvocet, Elavil, and Dolobid, but did not see her on these occasions.  A.R. 308.  However, in March, 1991, he declined to prescribe any more narcotics for her, noting that she had misused them in the past.  Id.  Dr. Anderson again recommended that Ms. Muckler see Dr. Renka for her emotional complaints, a recommendation that, again, appears not to have been followed by Ms. Muckler.  Id.

In June, 2000, nine years after Dr. Anderson's last office visit with Ms. Muckler, Ms. Muckler's lawyer wrote to Dr. Anderson and asked him to review select documents and render an opinion as to whether Ms. Muckler was capable of full-time employment in December, 1990, and to explain his opinion with reference to documents.  A.R. 1159.  With the letter, Ms. Muckler's lawyer provided Dr. Anderson the following documents for him to review in formulating his opinion:  (1) Dr. Anderson's treatment notes for Ms. Muckler; (2) Ms. Muckler's November 12, 1990, personal pain questionnaire; (3) a May 31, 2000, letter from Dr. Ray Strand; (4) and pages 2-15 of Ms. Muckler's opening brief in the appeal to district court in 1999.  A.R. 1159.

After reviewing these documents, Dr. Anderson wrote a letter dated June 22, 2000, in which he indicated that he had reviewed Dr. Strand's letter and the brief. A.R. 1160. Notably, Dr. Anderson's letter did *not* indicate that he had reviewed his own treatment records. Id. Dr. Anderson opined that Ms. Muckler was not capable of full-time work, although Dr. Anderson did not state a time frame during which he believed Ms. Muckler was unable to work. Id. Furthermore, Dr. Anderson opined that Ms. Muckler's psychological impairment was greater than her physical impairment, and stated as the reason for this opinion was that none of the treatments or exercises prescribed for Ms. Muckler by her variety of care givers seemed to improve her symptoms. Id.

### 3. Dr. Richard Renka

Dr. Anderson referred Ms. Muckler to Dr. Richard Renka in 1986 for a psychiatric evaluation. A.R. 278. Dr. Renka saw Ms. Muckler for that evaluation on October 15, 1986. A.R. 278-280. At that time, Dr. Renka recorded that Ms. Muckler "acknowledges depressed feelings. She says she cries a lot lately. She says the pain makes her cry." A.R. 278. Dr. Renka concluded that Ms. Muckler was not suffering from any psychiatric disorder. A.R. 279. He did note that it was extremely interesting that Ms. Muckler's sister-in-law had suffered a similar injury and progress about seven months prior to Ms. Muckler's injury. Id. He recommended that Ms. Muckler undergo

11

psychological testing and stated that he had scheduled Ms. Muckler to return to his office to undergo the Minnesota Multiphasic Personality Inventory (MMPI).  A.R. 280.  However, there is no other record in the A.R. concerning Dr. Renka's evaluation or treatment of Ms. Muckler, including no record of his administering the MMPI.

### 4.    Dr. Dong Cho, M.D.

On July 21, 1987, Dr. Cho evaluated Ms. Muckler and conducted an EMG study on a referral from Dr. Anderson and Dr. Phil DeGreef.  A.R. 145. Dr. Cho diagnosed Ms. Muckler with a myofascial syndrome affecting her "right" upper extremity. [sic] A.R. 147.  He also stated that she may have borderline carpal tunnel syndrome in her left side.  Id.  Based on normal nerve conduction studies and a negative "F-wave" study, Dr. Cho did not recommend thoracic outlet surgery for Ms. Muckler.  Id.  Instead, he recommended an intensive, outpatient pain management program.  Id.

Ms. Muckler enrolled in the program and Dr. Cho re-evaluated her after three days.  A.R. 149.  Ms. Muckler was quite positive about the program and its effects on her and she agreed to continue the program for another two weeks.  Id.

On July 30, 1987, Dr. Cho again saw Ms. Muckler.  A.R. 150.  At this time, Ms. Muckler was undergoing several hours of physical therapy per day and showing very positive results.  Id.  She was "more cheerful and positive"

about her condition on this visit.  Id.  The physical therapist who worked with Ms. Muckler reported good results from her therapy.  Id.  Dr. Cho recommended another two weeks of the program.  Id.

On August 7, 1987, Ms. Muckler visited Dr. Cho again.  A.R. 151.  She had experienced an exacerbation of her pain, but had persisted with her physical exercises.  Id.  Dr. Cho explained that she would experience such episodes of exacerbation occasionally, and that it was important to maintain her exercise program as the best way to cope with the pain.  Id.

On August 13, 1987, Ms. Muckler reported exacerbation with her pain, but this time she declined to participate in the physical therapy for a 24-hour period.  A.R. 152.  Dr. Cho again encouraged her to go back to the exercise program the next day and do as much as possible.  Id.  Ms. Muckler agreed to do so, stating that she believed her pain would reduce in the near future.  Id.

On August 17, 1987, Dr. Cho reported Ms. Muckler's increased pain over the last 10 days.  A.R. 153.  Dr. Cho prescribed a muscle relaxer, Norflex, and asked that she receive a psychological evaluation from Dr. Gary Dickinson.  Id.

Dr. Cho saw Ms. Muckler again on August 19, 1987, upon the completion of her physical therapy program and following her evaluation by Dr. Dickinson.  A.R. 154.  Dr. Cho recommended that she continue her

physical therapy exercises at home and gave her a one-month prescription for Norflex.  Id.  Ms. Muckler reported feeling better.  Id.

On November 2, 1987, Ms. Muckler saw Dr. Cho for a follow up visit. A.R. 155.  She reported that she had been attending outpatient physical therapy twice weekly in her hometown with good follow up.  Id.  She reported "feeling a lot better" and "doing more exercise."  Id.  Although Ms. Muckler reported occasional exacerbations of her pain, Dr. Cho recorded that she had shown faster recovery from such exacerbation than before.  Id.  Dr. Cho's examination showed significant improvement in Ms. Muckler's muscle strength and endurance in her upper extremities.  Id.  Dr. Cho expected that Ms. Muckler would continue to show improvement in her condition and recommended that she continue her physical therapy.  Id.

The final record from Dr. Cho is dated March 15, 1988, when he saw Ms. Muckler again.  A.R. 157.  At that point, Ms. Muckler's condition had deteriorated due to a prolonged exacerbation of her pain.  Id.  Dr. Cho expressed frustration that Ms. Muckler was 400 miles away and not subject to his closer supervision.  Id.  An x-ray taken the previous month showed "loss of cervical lordotic curvature due to muscle spasm."  Id.  Ms. Muckler also expressed frustration and depression over her increased pain.  Id.  Dr. Cho referred Ms. Muckler to a pain program at Black Hills Rehabilitation Hospital,

approximately 60 miles from Ms. Muckler's home, in March, 1989.  See A.R.

159.

### 5.    Dr. Gary L. Dickinson, Ph.D.

Dr. Dickinson completed a psychological assessment of Ms. Muckler on

August 17, 1987, at the request of Dr. Cho for purposes of the pain

management program.  A.R. 281-283.  Dr. Dickinson diagnosed Ms. Muckler

as having "chronic pain syndrome" and recommended that she be treated by

enrolling in a fairly intensive chronic pain program which includes stress

management, education to help her overcome the fear that she has about her

pain, and physical rehabilitation.  Id.

Dr. Dickinson apparently also administered the MMPI to Ms. Muckler.

A.R. 284.  The evaluation indicated that Ms. Muckler suffered "a mixed pattern

of symptoms in which somatic[3] reactivity under stress may be a primary

difficulty.  Because of the somatic symptoms the patient is experiencing, she

may present a picture of physical problems and reduced level of psychological

functioning.  Physical problems may be vague, may have appeared suddenly

after a period of stress, and may not be traceable to actual organic changes.

The patient is likely to view herself as somewhat virtuous . . .  This patient is

likely to be somewhat passive, dependent, and demanding in her interpersonal

---

[3]"Somatic" simply means "of or pertaining to the body," as opposed to the mind.

15

relations.  There is a possibility that she may attempt control of others through her physical symptoms."  Id.  The profile of Ms. Muckler provided by the MMPI was deemed to be valid by Dr. Dickinson.  Id.  Dr. Dickinson felt that a comprehensive pain treatment program would be appropriate for Ms. Muckler. Id.

**6.  Black Hills Rehabilitation Hospital**

Ms. Muckler was admitted to the Black Hills Rehabilitation Hospital on March 10, 1989, pursuant to Dr. Cho's referral.  A.R. 159, 168.  At the beginning and at the conclusion of the pain program, Scott Chapman, Psy. D., performed a psychological evaluation of Ms. Muckler that included the administration of the MMPI and a clinical interview.  A.R. 159, 168.  Upon Ms. Muckler's admission to the pain program, Chapman opined that Ms. Muckler's "profile . . . suggests a low energy level, a lack of vocational aggressiveness and a strong tendency to 'take to bed.' " A.R. 170.  Chapman also noted that she exhibited depression and tension, "both of which contribute to her chronic pain syndrome. . ." Id.  Chapman also wrote that Ms. Muckler's profile "indicates that she is extremely prone to evidencing pain behaviors and possibly using these in a manipulative fashion to attain nurturance and support from others.  She may also use these to avoid unwanted responsibilities and to manipulate interpersonal relationships." Id.

At the conclusion of the program, April 28, 1989, during the clinical interview, Ms. Muckler reported to Chapman that she had benefitted significantly from the pain management program, especially the relaxation techniques, education, and exercises. A.R. 159. She reported that, as a result of the program, she no longer needed pain medications and was sleeping much better. Id. She reported significant improvement in her posture and body movement with regard to her left upper extremity. Id.

Ms. Muckler's report of improvement was objectively verified as, at the conclusion of the pain program, she was able to walk for 30 minutes at a time without pain behaviors and perform aquasize therapy as indicated without pain behaviors. A.R. 163-166, 181. A daily activities screening conducted mid-way through this pain program indicated that Ms. Muckler took care of her own self care and did most of the household chores, including some yard work. A.R. 179. Ms. Muckler indicated that she was exercising daily, though minimally, including riding a bicycle or stationary bike. A.R. 179-180. She was also using two-pound weights and a yellow and red exercise tube to complete the exercises she had learned at Dr. Cho's program. A.R. 180.

The MMPI test results at the conclusion of the pain program indicated that Ms. Muckler "responded to the test items in a somewhat defensive manner by attempting to deny the presence of psychological difficulties and place herself in a favorable light." A.R. 159. As compared with the initial test results

upon her admission in March, the discharge test results showed a significant decrease in Ms. Muckler's depression and anger.  A.R. 160.  This was deemed significant as Ms. Muckler's depression and anger increased her experience of pain symptoms.  Id.  With decrease in anger and depression, Chapman opined that Ms. Muckler's likelihood of using her pain behaviors for interpersonal manipulation and to avoid unwanted responsibilities would also decrease.  Id.

Ms. Muckler had shown good improvement in all physical and mental aspects of her condition during the pain management program.  Id.  Chapman recommended that Ms. Muckler return to some sedentary level of employment "as quickly as possible" so as to avoid having Ms. Muckler regress to previous passive-aggressive levels of dysfunctional behavior whereby her pain behavior was reinforced.  Id.  This recommendation was echoed by Ms. Muckler's physical therapists from the pain program.  A.R. 166, 182.

After completing the pain management program, she was seen at Black Hills Rehabilitation Hospital for outpatient physical therapy in September, 1989.  A.R. 286.  At that time, she was upgraded to a Theraband with more resistance, and the therapist recommended an "aggressive swimming exercise program."  Id.  Ms. Muckler reported still experiencing pain, but being able to deal with it better.  A.R. 183.  Her activities included doing housework, caring for three dogs which included daily walking, and going out more, including

having spent a night out dancing.  A.R. 183-184.  She reported fixing her hair and applying makeup everyday.  A.R. 184.

### 7.    **Dr. Steven Goff, M.D.**

Dr. Steven Goff evaluated Ms. Muckler for a disability rating on February 16, 1990.  A.R. 287-290.  He agreed that she appeared to be suffering some type of dystrophy in her left upper extremity.  Id.  Dr. Goff recorded that Ms. Muckler told him she was using her left arm for functional activities such as vacuuming, doing the dishes, and dressing herself, but that she could not reach over her head or perform repeated activities with the arm and had to do things in short spurts.  Id.  Objectively, Dr. Goff found some decrease in range of motion in the mid-dorsal area, that Ms. Muckler's dorsum of her left hand was slightly more red than on the right, and that Ms. Muckler's left upper extremity was about 1/3 to ½ of the strength of the right.  Id.  He also documented muscle tightness in the occipital nuchal area on the left side and subjective lack of sensitivity in the left hand.  Id.  Other findings such as muscle atrophy, reflexes, temperature, and trigger points were normal.  Id.

### 8.    **Dr. Rachel Basse**

Dr. Rachel Basse conducted an independent multidisciplinary evaluation of Ms. Muckler on May 15, 1991.  A.R. 309-316.  Dr. Basse was not a treating physician, but rather an examining physician.  The evaluation was undertaken as part of Ms. Muckler's worker's compensation claim to determine whether

she was a good candidate for the thoracic outlet surgical release procedure. A.R. 309, 311.

Dr. Basse summarized her review of Ms. Muckler's treatment records to date, including her diagnosis of reflex sympathetic dystrophy. A.R. 309-311. She then documented Ms. Muckler's description of her left upper extremity symptoms as they were currently. A.R. 311.

Ms. Muckler described her daily activities to Dr. Basse as follows. She was independent in all aspects of self-care, and most aspects of household work, although she did experience difficulties with many of these activities and her husband helped out with dishes, cooking and vacuuming once a week. A.R. 312. Ms. Muckler also indicated that she is "responsible for all of the household maintenance" and that she "raises and walks her Boxer dogs on a regular basis." A.R. 315. In the few weeks before this evaluation, Ms. Muckler told Dr. Basse that she had done some yard work and some spring cleaning. A.R. 312. She also described riding an exercise bike five to ten miles daily, which involved 15 to 45 minutes of exertion. Id. She also described doing a full range of upper extremity strengthening exercises with two-pound hand weights. Id. She stated that she walks her dogs between one-half of a mile and a full mile at a medium pace. Id. She indicated that she anticipated returning to using her mountain bike once the weather improved. Id.

Dr. Basse conducted a physical examination of Ms. Muckler and found the following. Ms. Muckler used both upper extremities freely during the conversation with Dr. Basse, with only slight guarding of the left upper extremity noted. A.R. 313. No other pain behaviors were shown. Id. Ms. Muckler's reflexes were symmetric on both sides of her body. Id. She exhibited slight decreased sensation to light touch from her left thumb through the wrist. A.R. 314. She also showed mild weakness throughout distally greater than proximally. Id. Her strength and gait were normal. Id. Ms. Muckler's spine showed no evidence of scoliosis, kyphosis, or scapular winging and the posture of her head and shoulders were normal. Id.

Ms. Muckler showed mild tenderness and trigger points in her left cervical and posterior shoulder area. Id. She had full cervical and left shoulder range of motion. Id. She showed some numbness and tingling on the left with various pressure points being pressed or hyperabduction, or external rotation. Id. Her muscle bulk was symmetric on both sides without evidence of gross abnormalities. Id. No asymmetric color, temperature, sweat, hair distribution, nail or nailbed changes were noted upon examining Ms. Muckler's left and right upper extremities. Id.

Psychological testing of Ms. Muckler "suggested a very normal psychologic profile with some very mild defensiveness, depression and somatization." A.R. 315. Dr. Basse found that Ms. Muckler exhibited "a high

need for attention and affection and significant amounts of symptom mislabeling including nonpain symptoms as somatic pain." Id.  Dr. Basse stated that Ms. Muckler appeared to be "exaggerating her symptom presentation considerably with the possibility of a conscious component." Id. Finally, Dr. Basse expressed the suspicion that Ms. Muckler might "desire to present herself as more disabled than she is to either obtain Social Security Disability insurance and/or obtain attention at home and avoid responsibilities." Id.

Dr. Basse noted that Ms. Muckler had very recently been tapered off of long-term Coedine intake.  A.R. 316.  She noted that Ms. Muckler was currently taking Darvocet several times a week, a practice that Dr. Basse recommended also be discontinued.  Id.  In place of these pain medications, Dr. Basse recommended that Ms. Muckler be given a low dose tricyclic antidepressant on a "q.h.s" basis to assist with Ms. Muckler's sleep and any neurogenic components of her pain.[4]  Id.  Dr. Basse specifically opined that Ms. Muckler was not depressed.  Id.

### 9.    Dr. David Roos, M.D.

Dr. David Roos saw Ms. Muckler for a one-time consultation on May 15, 1991, shortly after Dr. Basse's evaluation.  A.R. 317-320.  Dr. Roos found

---

[4]"Q.H.S." is a medical abbreviation meaning "every night" or "at every bedtime."

tightness in Ms. Muckler's posterior cervical spine, normal range of motion on flexion and extension, but that her range of motion was impeded by pain when tilting the head to either side.  Id.  Dr. Roos documented no abnormalities in appearance, temperature, or perspiration of Ms. Muckler's right and left upper extremities.  Id.  Although Ms. Muckler had normal sensation for sharpness in both upper extremities, she had a reduced sensation for dullness in her left hand.  Id.  She had good biceps and hand strength in both arms, but poor triceps strength on the left.  Id.  Her reflexes were normal and equal bilaterally. Id.  Dr. Roos concurred in the diagnosis of reflex sympathetic dystrophy and recommended the thoracic outlet surgery.  Id.

### 10.    Dr. Stephen Manlove

Dr. Manlove first saw Ms. Muckler on March 9, 1992, after she began experiencing extreme anxiety and depression and had thoughts of suicide. A.R. 390.  Several times during the initial interview, Ms. Muckler expressed the wish that Dr. Manlove could prescribe some drug for her.  A.R. 393.  Although Dr. Manlove inquired about Ms. Muckler's use of street drugs on this date, Ms. Muckler said that she did not use them.  A.R. 392.  Dr. Manlove diagnosed a single episode of major depression without psychotic features.  A.R. 394.  He recommended that Ms. Muckler continue taking Prozac, and wean herself from Valium and Anexia.  Id.  Dr. Manlove saw Ms. Muckler seven times between his

first visit and October, 1992.  A.R. 395-401.  He did not see her again until 18 months later in January, 1994.  A.R. 407.

In January, 1994, Ms. Muckler was hospitalized for bizarre psychological symptoms including speaking to the devil, speaking to her long-dead grandmother, talking in rhymes, writing bizarre poetry, and walking outside barefoot in the winter.  A.R. 415-416.  At this time, she informed Dr. Manlove that she had been using the illegal street drug methamphetamine for the last "several years."  A.R. 417.  This would clearly date back to some time prior to her initial consultation with Dr. Manlove in March, 1992, when she reported experiencing extreme anxiety.  Ms. Muckler admitted that she had used methamphetamine in November, 1993, the same date she gave for the occasion when she talked to her dead grandmother.  A.R. 415, 417.

Later, during her hospitalization at the South Dakota Human Services Center, Ms. Muckler indicated that her husband is a drug user and was the person who introduced her to the use of methamphetamine.  A.R. 678.  Ms. Muckler's husband blamed her methamphetamine usage for the manic behavior that resulted in her hospitalization.  A.R. 686.  Dr. Manlove diagnosed Ms. Muckler as suffering from severe bipolar disorder, manic, without psychotic features.  A.R. 407.

### 11.   Dr. Kristy Farnsworth, Ph.D.

On April 19, 2006, Dr. Kristy Farnsworth undertook a review of all of Ms. Muckler's mental health records from 1985 through December 31, 1990, to evaluate her mental impairment.  A.R. 1279-1291.  Dr. Farnsworth never met with, administered any tests, or otherwise evaluated or examined Ms. Muckler in person.  Id.

Based on her review of the records alone, Dr. Farnsworth concluded that Ms. Muckler was not suffering from any medically determinable psychological impairment as of December 31, 1990.  A.R. 1279.  She found no functional limitations as a result of any mental condition.  A.R. 1288.

## B.   Testimony at the Hearings

### 1.   The First Evidentiary Hearing

The first evidentiary hearing was held before ALJ Conaway on September 25, 1997.  A.R. 36.  Three witnesses testified at the hearing:  Ms. Muckler; her husband, Jim Muckler; and vocational expert James Hardway.  The following is a summary of their testimony.[5]

Initially, the ALJ set forth the parameters of the evidence he would receive at the hearing.  A.R. 36-41.  He indicated that Ms. Muckler's first application was administratively final and constituted a barrier to seeking

---

[5]Ms. Muckler was represented at this hearing and thereafter by her present counsel of record.  A.R. 36.

disability benefits for the period prior to December 27, 1990.  Id.  Ms. Muckler

agreed that she was not attempting to reopen her first application for benefits.

Id.  The ALJ then set forth the fact that Ms. Muckler's insured status

terminated on December 30, 1990.  Id.  Ms. Muckler agreed that her insured

status was terminated on that day.  Id.  The ALJ then summarized that

Ms. Muckler's second and third claims presented the issue of whether she was

disabled during a four-day window from December 27 to December 30, 1990.

Id.  Ms. Muckler agreed.  Id.  Accordingly, the ALJ noted that it would limit the

introduction of testimony to the period for one year preceding the date that

Ms. Muckler's insured status terminated.  Id.  The ALJ noted that he would not

take evidence from the years subsequent to 1990 and that he acknowledged

that there had been significant psychiatric developments since that date that

might have given rise to the conclusion that Ms. Muckler was currently

disabled.  Id.  However, she was not currently insured, so that determination

was irrelevant, according to the ALJ.  Id.

Ms. Muckler testified as to various jobs she had held in the past and

what her duties at those jobs were.  A.R. 43-48.  She also testified that she had

a high school degree.  A.R. 43.

Ms. Muckler testified that her disability began on November 20,1985,

when she injured her left arm while working as a nurse's aide.  A.R. 48.

Ms. Muckler asserted that the problems that developed with her left upper

extremity in combination with her depression caused her to be disabled in December, 1990.  A.R. 50.

She testified that she had surgery on the arm in August, 1991.  A.R. 48-49.  She testified that constant pain and intermittent swelling in her left upper extremity limited her use of that arm, caused migraine headaches, and sometimes caused pain so bad that it made her vomit.  A.R. 51-52, 60.  The headaches lasted from two to seven days and occurred approximately once a month.  A.R. 60-61.  When she had one of these headaches, Ms. Muckler testified that she was bedridden.  A.R. 62.  Ms. Muckler also testified that she suffers fatigue frequently because the pain from her arm and headaches prevents her from sleeping soundly.

She testified that her arm condition limited her functioning such that she could not perform any repetitive motions and could lift only 10 pounds.  A.R. 51-52.  Using both hands, Ms. Muckler testified that she could lift 20 pounds, and 10 pounds with her left hand alone, though not for very long.  A.R. 53-54.  Ms. Muckler testified that her ability to walk was limited because "I wasn't really moving around very much then, maybe, I really can't recall"; she later amended this statement to say she could walk up to a quarter of a mile at a time or three to four minutes at a time.  A.R. 54, 56-57.  She testified that her ability to sit was less than give minutes without changing position.  Id.  She testified that she could only stand for a "couple minutes" at a time because she

had to constantly change positions due to the pain. A.R. 54-55. Ms. Muckler testified that in 1990 she spent most of the day lying down because it hurt to move. A.R. 55. She also testified that stress and cold weather make her pain and her left upper extremity worse. A.R. 59.

As of November, 1990, Ms. Muckler testified that she was taking prescription Tylenol III and Darvocet, both pain medications. Id. She was also taking Norflex, a muscle relaxant. Id.

Although Ms. Muckler filled out a daily activities questionnaire, she testified that she was able to complete household tasks only by working for a few minutes, then taking a break for five minutes up to a couple of hours, and then returning to the task. A.R. 62-63. Ms. Muckler testified that she was attending physical therapy in 1990 and riding either an exercise bicycle or a mountain bicycle two to three times per week for five to ten minutes at a time. A.R. 64-65. She also testified that she walked her dogs two to three times per week for five to ten minutes at a time. A.R. 65. She testified that she was able to get dressed and take care of herself during the day. A.R. 66. She testified that she needs to nap once or twice a day.

Ms. Muckler testified that the pain, headaches, fatigue, and physical limitations she described as being disabled with in 1990 continued up through the date of the hearing in 1997. A.R. 68-70. At the time of the hearing, Ms. Muckler was married to an over-the-road truck driver who was gone for

extended periods of time.  A.R. 42-43.  She and her husband cared for a two-year-old foster child, and Ms. Muckler had sole care of the child while her husband was gone working.  Id.  She indicated that she picks the child up to put her in to her car seat and helps her out of the vehicle.  A.R. 71. Ms. Muckler testified that she took the child to day care one to two days a week for six hours a day.  A.R. 70.  She also testified that family members sometimes help her care for the child.  Id.

Ms. Muckler testified that she had been treated by Dr. Strand, Dr. Sable, Dr. Manlove, and Dr. Renka for her mental condition.  A.R. 51.  She did not otherwise describe any symptoms of, or limitations as a result of, her depression.  A.R. 42-73.  Ms. Muckler's attorney did not expand on her mental condition when he exercised his opportunity to question her.  Id.

Ms. Muckler's husband, Jim Muckler, also testified.  Mr. Muckler stated that he had been married to Ms. Muckler for approximately 15 years.  A.R. 74. He testified that his wife does not sleep, and often sleeps sitting up in a chair. A.R. 75.  He confirmed that she is fatigued during the day and takes naps.  Id. Mr. Muckler testified that his wife's condition had remained constant since 1985.  Id.  Mr. Muckler confirmed that his wife suffers from headaches that are sometimes severe enough to make her vomit and that she treats the headaches by lying down.  A.R. 75-76.  Mr. Muckler testified that his wife tries to take care

of household tasks, that she must take breaks during the tasks, and that the tasks usually do not get completed.  A.R. 76.

James Hardway also testified as a vocational expert.  The ALJ asked Mr. Hardway whether a person between the ages of 20 and 32, with Ms. Muckler's past relevant work, a high school degree, and the ability to lift up to 60 pounds occasionally and to lift 30 pounds frequently, could return to any of Ms. Muckler's past relevant work.  A.R. 77-78.  Mr. Hardway testified that such a person could perform Ms. Muckler's past relevant work, with the exception of perhaps being a nurse's aide, which sometimes entails lifting more than 60 pounds.  A.R. 78.

Next, the ALJ asked Mr. Hardway to assume the same person in terms of age, education, and experience, but limited functionally to performing light work in terms of the person's ability to sit, stand, walk, push, pull, lift, and carry.  A.R. 79.  The ALJ asked Mr. Hardway to assume that this hypothetical person could occasionally climb and crawl, was right-hand dominant, and was limited in her ability to lift, reach, handle, and finger with her left hand to a maximum of two pounds.  Id.  Mr. Hardway testified that such a person could not perform any of Ms. Muckler's past relevant work.  Id.

Assuming that same hypothetical, the ALJ next asked Mr. Hardway whether there were any jobs existing in substantial numbers in the national economy that such a person could perform.  Id.  Mr. Hardway indicated that

there were several such jobs.  A.R. 79-80.  He identified the occupations of rest room attendant, guide (such as a plant guide or a sight-seeing guide), arcade attendant, and gate guard.  Id.

Finally, the ALJ next asked Mr. Hardway to assume a person with the same age, education, and past work experience as stated previously, but that the person is limited functionally to lifting only 10 pounds with her left hand, lifting 20 pounds with both hands, walking three to four minutes at a time, sitting five minutes at a time, standing two to ten minutes at a time, and laying down the majority of the day, with two to seven days a month bedridden.  A.R. 81.  Mr. Hardway testified that there would be no jobs such a person could do in the national economy.  Id.

Setting aside any functional limitations and focusing solely on absenteeism, Mr. Hardway testified that the most an employee could miss work in a month would be an average of three days a month, before such an employee would be unemployable.  A.R. 81-83.  Mr. Hardway also testified that a person who could use both upper extremities, but had to take a break after each use for a few minutes up to a half of an hour would not be able to perform the jobs in the national economy that he had outlined.  A.R. 83-85.

### 2. The Second Evidentiary Hearing

The second evidentiary hearing was held on August 17, 2000, following the district court's remand pursuant to the agency's unopposed motion to

remand.  Dr. James Simpson testified at this hearing.[6]  A.R. 1344.

Dr. Simpson stated that he is a certified medical health counselor and that he had read the exhibits in the record in Ms. Muckler's case.[7]  Id.  Ms. Muckler was never a patient of Dr. Simpson's.  A.R. 1345.

Dr. Simpson described Ms. Muckler's psychological problems in 1987, 1989, and 1991, as being depression, including feelings of worthlessness, irritability, being withdrawn and isolated, hopelessness, difficulty concentrating and attending, and problems with appetite.  A.R. 1346.  Dr. Simpson testified that Ms. Muckler suffered a single episode of major depression during the 1987-1989 time frame.  A.R. 1348-1349.  Dr. Simpson testified that Ms. Muckler's psychological condition deteriorated significantly in 1991 and 1992, when she was hospitalized and diagnosed with manic depression with psychotic features.[8]  A.R. 1347.

─────────────────────

[6]Dr. Simpson is not related in any familial way with Ms. Muckler's counsel, Michael Simpson.  A.R. 1344.

[7]The court notes that Dr. Simpson's later testimony makes evident the fact that his specialty is mental health.  Therefore, there is some question whether the tape of the hearing was accurately transcribed to reflect that Dr. Simpson stated that his specialty was "medical health" or whether Dr. Simpson actually testified that his specialty was *mental* health.  Compare A.R. 1344, with A.R. 1349 (the first page reference is typed as "medical" and the second is typed as "mental").

[8]Dr. Simpson's testimony as to the dates of Ms. Muckler's hospitalization are in error.  Instead of 1991 and 1992, the date of her hospitalizations were in January, 1994, and March-April, 1994.  See A.R. 406-881.

Dr. Simpson testified that he could not given an opinion as to how Ms. Muckler was functioning psychologically in December 1990 to a reasonable degree of medical certainty. A.R. 1348. Presumably, this was because there were no records in the administrative record from any mental health professionals for the period between 1989 (Dr. Chapman's evaluation) and 1991 (Dr. Basse's evaluation). See A.R. 1345-1346.

When Ms. Muckler's attorney pointed out that there were records subsequent to 1990 when Ms. Muckler's treating physicians and mental health experts noted she was suffering from depression, and the attorney asked Dr. Simpson to agree that it was more than likely that she suffered from depression throughout the period from 1987 to 1991, Dr. Simpson did *not* agree. A.R. 1350-1351. Instead, he testified that Ms. Muckler's records indicate that there were periods of time when her depression was in remission, for example, when she was attending pain management programs. Id. He also agreed she was suffering depressive symptoms on August, 24, 1990, and again on March 7, 1991. A.R. 1351.

Although Dr. Simpson never stated his own opinion that he believed Ms. Muckler was depressed in December, 1990, he did testify that he thought that the opinion of Ms. Muckler's treating physician, Dr. Anderson, would have been that Ms. Muckler was chronically depressed from August, 1990, through March, 1991. A.R. 1354-1355. Dr. Simpson also agreed, though he did not

state his own opinion to this effect, that Dr. Anderson's opinion was that Ms. Muckler's mental condition inhibited her from working in December, 1990. A.R. 1356-1357.

Ms. Muckler also provided additional testimony at the second evidentiary hearing. She testified that she attended a pain management program in 1989 and also saw a psychologist named Scott Chapman. A.R. 1359. She indicated that her depression was improved after attending the pain program. Id. She then testified that the pain in her left upper extremity got worse after this 1989 program, eventually leading her to undergo a surgery where a rib was removed, some muscle was removed, and a nerve was cut in the summer of 1991.[9] Id. She testified that when her pain would get worse, her depression symptoms also got worse. A.R. 1360. She testified that her depression got worse in the period from 1990 to 1991. Id. Ms. Muckler testified that during this period leading up to her rib surgery, she cried a lot. A.R. 1360-1361.

Regarding her left upper extremity pain, Ms. Muckler testified that, in December, 1990, she was in constant, severe pain that she described as an

---

[9]This was Ms. Muckler's lay description of the surgery. Later transcripts describe the surgery as: "transaxilary decompression of the thoracic outlet by first rib resection along with T2 ganglion thoracic sympathectomy to relieve special symptoms of reflex sympathetic dystrophy of the arm and hand and supra clavicular total anterior scalenectomy to decompress the upper nerves C5, C6, and C7 of the brachial plexus causing pain in the left side of her neck that radiates into the upper chest and down the radial nerve distribution of the arm. . ." A.R. 1325.

"ache." A.R. 1361-1362. Medication helped make the pain more tolerable, but never made it go away. A.R. 1362. She reiterated her daily activities in more summary fashion than she did at the 1997 hearing, but her description was consistent with her earlier testimony on that subject. Id.

As to her ability to function in December, 1990, Ms. Muckler testified that she could sit for up to an hour, but that she would be constantly changing position during that hour. A.R. 1363. She testified that, during that hour of sitting, she would not be able to do anything with her hands. Id. She testified that she could stand for five minutes at a time and walk for a quarter of a mile at a time. Id. In this hearing, she testified that she could not lift any amount of weight without feeling discomfort. A.R. 1364. She indicated that she could not push and pull with her left hand unless the resistance was very light, but she could push and pull with her right hand. A.R. 1364-1365. Ms. Muckler testified that she could not use the fingers on her left hand in December, 1990, because they did not grasp. A.R. 1365. She also testified that she was unable to sense boiling water or cold water on her left hand. A.R. 1365-1366.

### 3.    The Third Evidentiary Hearing

The third evidentiary hearing was held before ALJ Olson, as was the second, and took place on December 7, 2001. A.R. 1320. Dr. Stephen William Asher testified at the hearing. Id. Dr. Asher testified that the Social Security Administration had previously provided him with all of Ms. Muckler's medical

records from the A.R., a stack of documents that Dr. Asher estimated to be six inches tall. A.R. 1321. Dr. Asher testified that it is his usual practice to review everything that is sent to him by the Social Security Administration and that he believed he had reviewed all the records. A.R. 1320-1321, 1335. He was asked to give an opinion about Ms. Muckler's condition in December, 1990. Id. However, he testified that he had a number of years of records which he believed the review of would allow a much more accurate, complete, and correct conclusion as to her condition during December, 1990.

Dr. Asher discussed the "rib surgery" that Ms. Muckeler underwent in the summer of 1991.[10] A.R. 1325-1326. He testified that this surgery is performed to treat reflex sympathetic dystrophy and various intractable related pain disorders. A.R. 1326. Dr. Asher testified that the surgery was not generally associated with satisfactory results. Id. Dr. Asher testified that the surgery Ms. Muckler underwent was a treatment of "last resort" for someone suffering from reflex sympathetic dystrophy who was suffering severe pain and for whom other treatment modalities had not proved successful. A.R. 1326-1329. Dr. Asher indicated that reflex sympathetic dystrophy can often be over-diagnosed because often the health care provider cannot see and document the

---

[10]See footnote 5, supra, for a more technical description of the procedure.

objective findings and, instead, must rely on the patient's description.  A.R. 1328-1329.

As to the objective findings indicative of reflex sympathetic dystrophy, Dr. Asher described those as follows.  A.R. 1333-1334.  First, there would be an antecedent injury to the affected extremity.  A.R. 1333.  Second, there would be changes that developed in the appearance of the skin of the extremity, like wasting of the fingers so that they become glistening and smaller or more slender than the fingers of the unaffected hand.  Id.  Third, there would be changes in the fingernails.  A.R. 1334.  Fourth, often the hair on the tops of the fingers will change or be lost.  Id.  Finally, there will be vascular instability, manifesting itself as intense whiteness or redness in the hand.  Id.  The subjective complaint is usually poorly localized pain.  Id.  Dr. Asher testified that these elements were not present in Ms. Muckler's medical records up to and including December, 1990.  Id.

On cross-examination, however, Dr. Asher did not disagree that Ms. Muckler had complained of swelling in her left hand and that temperature differences between her left hand and right hand were documented in her records.  A.R. 1336.  Dr. Asher testified that positive Tenel's sign and Falen's test were objective findings indicating compression of a peripheral nerve, but that neither was a feature of reflex sympathetic dystrophy.  A.R. 1336-1337.

### 4. The Fourth Evidentiary Hearing

The final evidentiary hearing held in this case was on April 20, 2006, before ALJ Donovan.  A.R. 1293.  Although arrangements had been made for Dr. Farnsworth, a mental health expert, to testify at the hearing, a snowstorm intervened and Dr. Farnsworth was not present.  A.R. 1295

Ms. Muckler testified that she had reviewed her testimony from the 1997 hearing and found it to be accurate.  A.R. 1299-1301.  She also testified that she reviewed her pain questionnaire from November, 1990, and confirmed that it was accurate with one correction.  A.R. 1301.  She stated that she would either have ridden her bike two to three times a week or walked her dogs two to three times per week, but not both.  Id.  Ms. Muckler confirmed that she was right-hand dominant.  A.R. 1302-1303.

William Tisdale, a vocational expert, also testified.  A.R. 1303.  The ALJ asked Mr. Tisdale to assume a worker with Ms. Muckler's age, education, and experience as of December, 1990.  A.R. 1308.  He then asked Mr. Tisdale to assume this worker was right-hand dominant, could do light exertional work with her right hand, and sedentary work with her left hand.  Id.  The ALJ asked Mr. Tisdale to assume that in terms of reaching or handling, again with the left non-dominant arm, the worker was limited to doing so only frequently.  Id.  He further specified that the worker could not climb ladders, ropes or scaffolding

and that she could not be around hazards like unprotected machinery, dangerous unprotected heights or anything of that nature.  A.R. 1308-1309.

Based on this hypothetical, the ALJ asked Mr. Tisdale if there was any of Ms. Muckler's past relevant work that the hypothetical worker could perform.  A.R. 1309.  Mr. Tisdale testified that she could perform the past work of general office clerk.  Id.

Based on the same hypothetical, the ALJ asked Mr. Tisdale if there were other jobs existing in the national economy that the worker could perform.  Id.  Mr. Tisdale testified that there were such jobs.  Id.  He gave examples such as a charge account clerk and a call out operator, which were both unskilled, sedentary jobs.  A.R. 1309-1310.  Mr. Tisdale also testified that the hypothetical worker described by the ALJ could also perform the job of survey worker, which was unskilled, light work.  A.R. 1310.

The ALJ then posed a second hypothetical.  Id.  He asked Mr. Tisdale to assume that the worker was capable of sedentary work only with both arms, and had all the additional limitations previously described in the first hypothetical.  Id.  As to the second hypothetical, Mr. Tisdale testified that this worker would not be capable of performing any of Ms. Muckler's past relevant work.  A.R. 1310-1311.  However, the sedentary jobs which Mr. Tisdale previously described (charge account clerk and call out operator) would be

within the capabilities of the worker described by the second hypothetical.  A.R. 1311.

Mr. Tisdale testified that if a worker missed on average more than two to three days of work per month, an employer would not tolerate this and could terminate the employee's job.  A.R. 1311-1312.  Mr. Tisdale testified that if an unskilled worker could not sit more than 5 to 10 minutes at a time, or if they had to lie down to relieve their pain more than two 15-minute breaks during a day and during a lunch period, the worker would not be employable.  A.R. 1312-1314.

## C.    Decision of ALJ Donovan

ALJ Donovan issued a written decision on June 15, 2006, denying benefits to Ms. Muckler.  A.R. 1001-1016.  In that decision, the ALJ clarified that the only period at issue in his decision was whether Ms. Muckler was disabled during the four-day period from December 27, 1990, to December 30, 1990, a fact not disputed by Ms. Muckler.  A.R. 1005-1007.  However, the ALJ noted that "medical impairments may have a longitudinal effect beginning before and after the claimant's period of December 27, 1990 through December 31, 1990," and, therefore, the ALJ reviewed the entire record in Ms. Muckler's case.  A.R. 1007.

The ALJ articulated the five-step evaluation process for determining whether a Social Security disability claimant is "disabled."  The five-step

sequential evaluation process as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience);(4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

During the time period applicable to Ms. Muckler's application for benefits, she was 25 years old, had a high school education, and had held jobs as a nurse's aide, a general office clerk, and a waitress. A.R. 1006.

The ALJ determined that Ms. Muckler had not engaged in substantial gainful employment since December 27, 1990. A.R. 1008. The ALJ determined that Ms. Muckler suffered from chronic pain and that this pain was a severe impairment at step two of the analysis. A.R. 1009.

The ALJ determined that Ms. Muckler did not suffer from a severe mental impairment, however. Id. In reaching this conclusion, the ALJ reviewed and

discussed mental health records from Dr. Anderson, Dr. Sabow, Dr. Richard Renka, Dr. Scott Chapman, Dr. Rachel Basse, Dr. Steven Manlove, and Dr. Kristy Farnsworth.  Id.  Those records indicated that, although Ms. Muckler suffered from some depression, she appeared to be exaggerating her symptoms considerably.  Id.  Furthermore, although the records indicated that Ms. Muckler was hospitalized for her mental condition in March, 1994, and diagnosed with bi-polar disorder at that time, the records also indicate that she had used methamphetamine over the last several years up through November, 1993.  Id.  The records indicate that she was also using marijuana ("cannabis") during the period of her hospitalization.  Id.  Finally, the records indicated that Ms. Muckler was receiving Prozac based on telephone calls to Dr. Sabow's office.  Id.  That prescription appears to have ceased after 1993, the same period of time during which Ms. Muckler's use of methamphetamine ceased. Id.

At step three of the analysis, the ALJ determined that Ms. Muckler's chronic pain did not meet or equal any medical listing.  A.R. 1010. Accordingly, the ALJ went on to step four to assess Ms. Muckler's residual functional capacity ("RFC") in order to determine whether she could return to any past relevant work.  In evaluating Ms. Muckler's RFC, the ALJ considered the limiting effect of her mental condition, even though that condition did not meet the definition of "severe" at step two.  A.R. 1012.

The ALJ concluded that Ms. Muckler's RFC allowed her to perform "light" work with her uninjured, dominant arm and sedentary work with her disabled left arm. A.R. 1014. The ALJ's assessment of Ms. Muckler's RFC included limitations eliminating any climbing of ropes, ladders, or scaffolds and protection from workplace hazards such as unprotected heights, dangerous machinery, and things of that nature. Id. In concluding that Ms. Muckler had this RFC, the ALJ considered and discussed Ms. Muckler's own testimony, at the administrative hearings, in documents she filled out and submitted to the agency, and in medical records that recorded what she told her care providers. A.R. 1013-1014. In addition, the ALJ considered and discussed the opinions of Ms. Muckler's treating physicians, including Dr. Anderson's opinions. Finally, the ALJ considered the opinions of non-treating physicians.

As to Ms. Muckler's testimony in the record, the ALJ credited some of her testimony, and discredited some. He did likewise as to the opinions of Ms. Muckler's treating physicians' opinions.

As to the opinions of Ms. Muckler's treating physicians, the ALJ discussed Dr. Anderson's records specifically. Ms. Muckler saw Dr. Anderson in March, 1990, and, at that time, it had been a full year since she had last sought treatment from Dr. Anderson, seeing him previously in March, 1989. A.R. 1012. In an October 11, 1990, record from Dr. Anderson, her physician indicated that Ms. Muckler was riding her mountain bike on a regular basis

and performing her physical therapy exercises. A.R. 1012. His visit with Ms. Muckler on this date also indicated that her overall outlook on life was improved, she was sleeping better, and she reported only intermittent pain which went away rapidly with her changing position and rubbing her arm. A.R. 1013. Dr. Anderson rendered his opinion as of this date that Ms. Muckler was capable of performing work in a light duty position, such as a clerk, receptionist, or cashier. A.R. 1012. This record from Dr. Anderson was created *after* Ms. Muckler sustained her allegedly disabling injury (which was in November, 1985), and only two months from the four-day window during which Ms. Muckler must demonstrate that she was disabled.

Records from before the four-day window and after the four-day window also indicated to the ALJ that Ms. Muckler was capable of the RFC found by the ALJ. When Ms. Muckler finished physical therapy in April, 1989, she was encouraged to return to work so long as she did not lift more than 60 pounds occasionally and no more than 30 pounds frequently. A.R. 1013. A follow-up evaluation on September 14, 1989, recorded Ms. Muckler's statement that she was caring for three dogs, doing housework, fixing her hair daily, exercising daily, and had recently gone dancing. A.R. 1013. After the four-day window, Ms. Muckler reported to Dr. Sabow in December, 1992, that she was exercising successfully with a NordicTrack, though not so successfully with her upper body. Id.

The ALJ discredited Ms. Muckler's testimony about her ability to function in December, 1990, because that testimony was not consistent with the reports of the treating, examining, and reviewing physicians nor was her testimony consistent with the records showing what her daily activities were. A.R. 1013. The ALJ noted that no medical evidence corroborated or substantiated her claims of extreme restrictions in activity and, as of December, 1990, no physician was suggesting that Ms. Muckler not work. Id.

Although the ALJ acknowledged that Ms. Muckler had a "plethora" of medical records, he summarized them as indicating that Ms. Muckler received little medical treatment after her 1991 rib resection surgery, and what treatment she did receive he characterized as "conservative." A.R. 1012.

The ALJ specifically discussed Dr. Basse's May, 1991, report indicating that testing showed that Ms. Muckler "showed a significant amount of symptom mislabeling, and that '[the claimant] does appear to be exaggerating her symptoms presentation considerably with the possibility of a conscious component . . . I would be suspicious of her desire to present herself as more disabled than she is either obtain [sic] Social Security Disability insurance and/or obtain attention at home and avoid responsibilities.' " Id.

The ALJ held that Ms. Muckler's testimony as to her restrictions were inconsistent with her previous report that she mountain biked and exercised regularly. Id. Ms. Muckler's later attempt to "change her story" with regard to

these activities by testifying otherwise only further weakened Ms. Muckler's credibility in the ALJ's estimation. Id.

The ALJ specifically discounted a letter written by Dr. Anderson some ten years after the four-day window of Ms. Muckler's potential disability. A.R. 1013-1014. In this letter, Dr. Anderson opined that Ms. Muckler's physical and psychological conditions rendered her unable to work full time. A.R. 1013. Dr. Anderson went on to opine that Ms. Muckler's psychological impairment was greater than her physical impairment. Id. The ALJ discounted Dr. Anderson's ten-year-old letter because: (1) it was contradicted by his own, contemporaneous, assessment of Ms. Muckler's functioning in 1990 in which he opined that she could perform light work; (2) the ten-year-old opinion Dr. Anderson offered of Ms. Muckler's psychological function was outside his own area of expertise because Dr. Anderson is an orthopedic physician, not a psychologist or a psychiatrist; (3) Dr. Anderson's ten-year-old opinion was contradicted by opinion evidence from the field of psychology which found that Ms. Muckler's mental impairment was not severe in December, 1990; and (4) Dr. Anderson's ten-year-old opinion was rendered after a review of only select documents, not a review of all of Ms. Muckler's medical records in the A.R. A.R. 1013-1014.

Based on the vocational expert's testimony at the hearing, the ALJ concluded that Ms. Muckler's RFC would allow her to return to her past

relevant work as a general office clerk.  A.R. 1014.  Thus, the ALJ concluded

his analysis at step four, finding Ms. Muckler not disabled.  A.R. 1014-1015.

Although Ms. Muckler sought review of ALJ Donovan's decision before

the agency Appeals Council, the Appeals Council declined jurisdiction on

January 9, 2008.  Thus, ALJ Donovan's decision is the final agency decision for

purposes of this appeal.

## DISCUSSION

**A.    Standard of Review**

The decision of the ALJ must be upheld if it is supported by substantial

evidence in the record as a whole.  See 42 U.S.C. § 405(g); Choate v.

Barnhart,457 F.3d 865, 869 (8th Cir. 2006).  Substantial evidence is less than a

preponderance, but enough evidence that a reasonable mind might find it

adequate to support the conclusion.  See Baker v. Barnhart, 457 F.3d 882, 892

(8th Cir. 2006); see also McKinney  v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000);

Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L.Ed. 2d

842 (1971).  Review by this court extends beyond a limited search for the

existence of evidence supporting the Commissioner's decision to include giving

consideration to evidence in the record which fairly detracts from the decision.

See Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006); Craig v. Apfel, 212

F.3d 433, 435 (8th Cir. 2000).

The court's role under § 405(g) is to determine whether there is

substantial evidence in the record as a whole to support the decision of the

Commissioner and not to re-weigh the evidence.  See Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  Furthermore, a reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)); see also Eichelberger  v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004).  The court must review the Commissioner's decision to determine if an error of law has been committed.  See Olson ex rel. Estate of Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).  Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act.  See Smith, 982 F.2d at 311; see also Olson ex rel. Estate of Olson, 170 F.3d at 824.  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently.  See Baker, 457F.3d at 892.

A five-step analysis determines eligibility for Title II disability benefits.  See House v. Astrue, 500 F.3d 741, 742 n.1 (8th Cir. 2007).  The five-step sequential evaluation process as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities;

(3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience);(4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there is work in the national economy that the claimant can perform.  Baker  v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).  "Work in the national economy" can be shown by showing that work in significant numbers exist in the region where the claimant lives, or in several regions of the country.  Mathews v. Eldridge, 424 U.S. 319, 336 n.14 (1976).

Ms. Muckler appeals the decision of the agency, claiming three errors: (1) that the ALJ erred in determining that Ms. Muckler's mental impairment was not severe; (2) the ALJ erred in rejecting the opinion of Ms. Muckler's treating physician; and (3) the ALJ erred in discrediting Ms. Muckler's testimony.

**B.     Whether the ALJ Erred in Concluding that Ms. Muckler's Mental Condition Was Not a Severe Impairment**

Ms. Muckler argues that her depression constituted a severe impairment for purposes of step two of the analysis and that the ALJ erred in concluding otherwise.  The ALJ applied the following analysis to step two:

> At the second step of the Sequential Evaluation Process, the undersigned must determine whether the claimant has a medically determinable impairment, or a combination of impairments, which is "severe." "Severity" is not equivalent to a finding of "disability" under the Act. 20 C.F.R. § 404.1520. An "impairment" is defined as anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1508. A claimant's symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, or any other alleged problems, are not alone sufficient to establish such an impairment unless medical signs or laboratory findings show that a medically determinable impairment is present and that it could be reasonably expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b).
>
> To meet the burden of proof at this step, all the claimant needs is a "de minimis" showing of medical severity. An impairment is considered "not severe" if it is only a slight abnormality, having such minimal effect on the claimant so that it would not be expected to interfere with the ability to work irrespective of age, education, or work experience. A "severe" impairment is one that significantly limits the claimant's physical or mental ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1521 and 404.1529. *See also* Social Security Rulings 85-28; 96-3p and 96-4p.

See A.R. 1008. Ms. Muckler does not take issue with the accuracy of the ALJ's statement of the law as to step two. Rather, she takes issue with the conclusion reached by the ALJ after applying the above standard to the evidence.

Ms. Muckler argues that the evidence in this case indicates she suffered from a severe mental impairment in December, 1990. She argues that the evidence shows that she suffered a severe bout of depression from August, 1987, until she completed a pain management program in April, 1989, at

which time her depression went into remission.  <u>See</u> Appellant's Brief, Docket

16, pages 30-31.  She then argues that she suffered another bout of depression

beginning in August, 1990, that lasted through March, 1991.  <u>Id.</u> at 31-33.

Ms. Muckler then states that she underwent another bout of depression

beginning in November, 1991, and lasting until October, 1992.  <u>Id.</u> at 34.  She

then states that she suffered a "schizophrenic break" in January, 1994,

resulting in her hospitalization at a mental health facility from January until

April, 1994.  <u>Id.</u>

 Ms. Muckler argues that the law recognizes that periods of remission are

an inherent feature of "psychotic illnesses" and that, just because one

experiences a period of remission does not mean that the disability has ceased.

<u>Id.</u> at 35 (citing <u>Miller v. Heckler</u>, 756 F.2d 679, 681 n.2 (8th Cir. 1985) (per

curiam); <u>Poulin v. Bowen</u>, 817 F.2d 865, 875 (D.C. Cir. 1987)).

 In the <u>Miller</u> case relied upon by Ms. Muckler, an ALJ had denied

benefits based on alleged mental impairments, severe pain, blackouts, and

weakness.  <u>Miller</u>, 756 F.2d at 680.  The administrative record in that case

indicated that the claimant had been treated at the Western Missouri Health

Center for at least six years preceding her application for benefits, and that she

had been seen on a number of occasions for both outpatient and emergency

visits at the mental health center, including at least one hospitalization.  <u>Id.</u>

The records from the hospitalization indicated the claimant was displaying

"very paranoid symptoms" and "very somatic symptoms" and that she was diagnosed with "acute paranoia psychosis with delusions." Id. The ALJ concluded that the claimant's conditions did not meet or or equal the criteria in the Listing of Impairments and, thus, denied benefits, concluding that her mental illness was in remission and responsive to medication. Id.

The Eighth Circuit reversed, finding that the ALJ failed to fulfill his duty to develop the record. Id. The claimant's mental health records were all hand-written entries which were illegible "either because of the poor quality of the reproduction, the handwriting of the physician, or both." Id. (quoting Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir. 1975)). Because the mental health records were illegible, the court had no confidence that the ALJ had fully understood the medical reports in the record. Id. at 680-681. The court remanded with instructions for the ALJ to submit interrogatories to the claimant's treating physician as well as the agency's physician in order to give both doctors the opportunity to address the issue of the claimant's mental impairment. Id.

In a footnote, the Miller court noted that the fact that a claimant's psychotic illness was in remission was not determinative of whether she suffered from a severe impairment or was disabled. Id. at 680 n.1. The court also noted that, at the time of the remand, the agency was in the process of

revising its criteria in the Listing of Impairments applicable to mental disorders. Id. at 681 n.2.

The facts in Miller stand in stark contrast to the facts of Ms. Muckler's case. The agency cannot be faulted for failing to develop the record in Ms. Muckler's case–her administrative record consists of over 1,300 pages of medical and other related documents. Those documents include full and fair opportunities given to both Ms. Muckler's treating physicians and to agency physicians to review the evidence and express their opinions of Ms. Muckler's impairments.

Furthermore, although both Ms. Muckler and the claimant in Miller suffered hospitalizations as a result of their mental impairments, Ms. Muckler's hospitalization was *outside* the time frame relevant to the question of her disabled status, while the Miller claimant's hospitalization was *during* the relevant time frame. Also, the Miller claimant was diagnosed as suffering from acute paranoia psychosis with delusions during the relevant time frame, while Ms. Muckler's undifferentiated diagnosis was merely "depression" during the relevant time frame.

Finally, the Eighth Circuit reversed the ALJ in Miller at a time when the agency was revising its criteria relative to mental impairments so as to more realistically reflect the nature of mental illness. Id. at 681 n.2. Presumably, those more-realistic standards were in place at the time Ms. Muckler's case

made its way through the administrative process.  No allegation that the

agency's standards are currently in flux has been made by Ms. Muckler.[11]

In considering whether a mental impairment is "severe" at step two of the

sequential analysis, the ALJ is directed to consider whether the impairment

affects the claimant in four areas:  (1) activities of daily living; (2) social

functioning; (3) concentration, persistence, or pace; and (4) episodes of

decompensation.  See 20 C.F.R. § 404.1520a(c)(3).  As to the first three

categories, the ALJ is instructed to rate the degree of limitation imposed by the

mental impairment on a five-point scale:  none, mild, moderate, marked, and

extreme.  Id. at subsection (c)(4).  The fourth category, periods of

decompensation, is rated on a four-point scale:  none, one or two, three, four or

more.  Id.  The last point on either the four- or five-point scale indicates a

degree of limitation not compatible with substantial gainful employment.  Id.  A

_____

[11]The court also notes that there is at least the suggestion in the record
that Ms. Muckler's schizophrenic break in January, 1994, may have been
related to her abuse of the illegal drug methamphetamine, which continued for
some years up to and including November, 1993, and her use of marijuana
right up to March, 1994.  If alcoholism or drug addiction is a contributing
factor to one's disabled status, then the claimant is not entitled to disability
benefits unless she can show that she would be disabled absent the use of
drugs or alcohol.  Slater v. Barnhart, 372 F.3d 956, 957 (8th Cir. 2004).  It is
the claimant's burden to show that she is disabled absent the use of drugs or
alcohol.  Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003).
However, Ms. Muckler's apparent drug use or addiction formed no part of the
ALJ's analysis of her claim (probably because the time frame of her meth use
and subsequent hospitalization were so far removed in time from the relevant
period of December, 1990), so the court does not analyze Ms. Muckler's claim
under this line of authority.

rating of "none" on either scale, and a rating of "mild" on the five-point scale generally supports the conclusion that the impairment is not severe.  Id. at subsection (d)(1).

Here, the evidence during the relevant time frame–December, 1990–supports the ALJ's determination that Ms. Muckler's mental impairment was not severe.  Dr. Anderson first noted that Ms. Muckler appeared to suffer from depression on October 15, 1986.  At that time he referred her to Dr. Richard Renka for a psychiatric evaluation.  A.R. 278.  Dr. Renka evaluated Ms. Muckler and found no psychiatric disorder, and recommended that she undergo a psychological evaluation.  A.R. 278-280.  Dr. Scott Chapman conducted a psychological screening in March, 1989, which showed that Ms. Muckler had a low energy level, a lack of vocational aggressiveness, and a strong tendency to "take to bed."  A.R. 170.  She was noted to be experiencing depression and tension, but it was also noted that she was extremely prone to evidencing pain behavior to manipulate others to attain nurturing and support. Id.  Furthermore, in another evaluation conducted six weeks later in April, 1989, Dr. Chapman noted that Ms. Muckler's mental status had improved substantially.  A.R. 159-160.  Dr. Chapman recommended that she become employed very quickly before she had a chance to regress to earlier, manipulative and dysfunctional psychological practices.  Id.

In a multidisciplinary evaluation of Ms. Muckler within five months of the four-day window when she must show she was disabled, Dr. Rachel Basse wrote that Ms. Muckler did not appear to be depressed and that a low dose of tricylcic antidepressant medication would be used to assist Ms. Muckler sleep and to address any neurogenic components of pain. A.R. 316. As the ALJ noted in his decision, Dr. Basse also found significant evidence that Ms. Muckler was exaggerating her symptoms to present herself as more disabled than she is. A.R. 315.

Finally, Dr. Kristy Farnsworth, Ph.D., conducted a independent psychological review of the records and concluded that there was no evidence of any medially determinable psychological impairment as of December, 1990, and that Ms. Muckler suffered no functional impairment as a result of any mental condition. A.R. 1279-1291. Thus, summarizing, mental health professionals who either evaluated Ms. Muckler or who reviewed her records document no medically determinable impairment for the period of time in question or document a propensity on the part of Ms. Muckler to exaggerate her symptoms so as to manipulate others.

Dr. Anderson, the only doctor to "document" Ms. Muckler's depression during the appropriate time frame, is an orthopedic physician, not a mental health expert, so his opinion on this subject is not entitled to as much weight as the opinions of mental health experts. Furthermore, the record from

Dr. Anderson documenting Ms. Muckler's complaint of depression is dated August, 1990. Dr. Anderson's own records from three months later in October, 1990, show that Ms. Muckler was no longer complaining of depression, and that she described her emotional outlook and pain as much improved.

Dr. Anderson's letter of June 22, 2000, nine years after he last saw Ms. Muckler as a patient, is deficient to support reversing the ALJ for several reasons. First, Dr. Anderson apparently did not review his own records and rely upon them in coming to his conclusion because he did not recite having done so in preparing the opinion. A.R. 1160. This is significant because, as discussed above, Dr. Anderson's own records from October, 1990, contradict his opinion contained in the June, 2000, letter he wrote. Also, Dr. Anderson is an orthopedic physician, not an expert in mental health issues, so his opinion is entitled to less weight than the opinions of mental health experts. In addition, Dr. Anderson's opinion is not supported by the opinions of experts in the mental health field, such as Dr. Renka, Dr. Chapman, Dr. Dickinson, Dr. Basse, and Dr. Farnsworth. Also, Dr. Anderson's opinion was based on a review of only select documents, not Ms. Muckler's entire record. In particular, Dr. Anderson appears never to have been given the opportunity to review the records from Dr. Chapman, Dr. Dickinson, Dr. Basse, or Dr. Farnsworth. Finally, Dr. Anderson's letter was written nine years after he last saw Ms. Muckler, lending credence to the idea that his records created

contemporaneously with his treatment of her are a more accurate reflection of his assessment of her condition than the letter written nearly a decade later.

Ms. Muckler makes much of the testimony she elicited at the second evidentiary hearing before the agency in which Dr. James Simpson testified that it was *Dr. Anderson's opinion* that Ms. Muckler suffered from a continuous depression from August, 1990, to March, 1991. A.R. 1354-1355.[12] However, as noted above, Dr. Anderson is not a mental health professional and the several professionals who did render opinions in this case contradict his opinion. Dr. Simpson, the professional whose testimony was being elicited, never testified that it was *his* opinion that Ms. Muckler was depressed in December, 1990. A.R. 1348. Dr. Simpson is himself a mental health expert. A.R. 1344.

Finally, the court notes that the record of Ms. Muckler's seeking help for her mental status also supports the ALJ's determination that she did not suffer from a severe mental impairment in December, 1990. Although Dr. Anderson recommended that Ms. Muckler go back to see Dr. Renka for her depression in August, 1990, Ms. Muckler did not follow that recommendation then or at any

---

[12]Of course, one need not guess at what Dr. Anderson's opinion was on this subject. As discussed above, he issued a letter in June, 2000, at the request of Ms. Muckler's attorney that Ms. Muckler's psychological condition was disabling. See A.R. 1160. The second hearing was held on August 17, 2000, so Dr. Anderson's letter from two months previous was available to Dr. Simpson. See A.R. 1344.

time thereafter, nor did she seek help at that time from any other mental health professional. Prior to August, 1990, she consulted Dr. Renka only once for the purpose of having an evaluation, not for receiving any treatment. A.R. 278-280. She did seek Dr. Manlove's help in March, 1992, but appears to have been motivated, at least in part, by a desire to obtain prescriptions for drugs. A.R. 390-394. In any case, she concluded her consultation with Dr. Manlove after only seven months and eight visits, A.R. 395-401, and did not see him again until her hospitalization in January, 1994 (approximately 16 months later), when the impetus for her psychological problems appear to be related, at least in part, to her use of illegal street drugs. A.R. 415-417, 678, 686.

The ALJ's decision is not contrary to the assertion made by Ms. Muckler that mental impairments typically cycle through periods of remission. The ALJ's decision was not based on the fact that Ms. Muckler's depression was in remission in December, 1990. Rather, it was based on the evidence that showed that, even when her depression was not in remission *during the relevant time frame*, it was not severe. When Ms. Muckler claimed she was depressed in August, 1990, Dr. Anderson's response was to recommend that she take up her physical therapy exercises again as the antidote. A.R. 223. Ms. Muckler did so, and reported three months later that her emotional state was much improved. A.R. 223. Dr. Anderson also recommended in August, 1990, that Ms. Muckler see Dr. Renka again. Id. The fact that Ms. Muckler

did not follow through on this recommendation also supports the conclusion that she herself did not feel her depression was "severe" at that time.

While the court recognizes the very serious nature of Ms. Muckler's mental condition during her hospitalization in January and March-April, 1994, the law requires this court to limit its analysis to the period from December 27, 1990, through December 31, 1990, a period of time over three years prior to this hospitalization.  The 1994 hospitalization is too remote in time to be indicative of her condition in December, 1990.  Furthermore, the record suggests that Ms. Muckler's use of methamphetamine and marijuana in and around the time of her hospitalization and for several years preceding that hospitalization may be an independent, intervening factor contributing to her poor mental state at the time of the 1994 hospitalization.  A.R. 415-417, 678, 686.  The court recommends affirming the ALJ's decision that Ms. Muckler's mental impairment in December, 1990, was not "severe."

**C.      Whether the ALJ Erred in Rejecting the Opinions of Dr.Sabow and Dr. Anderson as to Ms. Muckler's Ability to Work**

**1.      The Standard Applicable to Evaluation of Medical Evidence**

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004)); see also  Cox v. Astrue, 495 F.3d 614,

619 (8th Cir. 2007) (because RFC is a medical question, the ALJ's decision must be supported by some medical evidence of the claimant's ability to function in the workplace, but the ALJ can consider nonmedical evidence as well).

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC. See 20 C.F.R. § 416.927(a)(2). All medical opinions are evaluated according to the same criteria, namely:

> –whether the opinion is consistent with other evidence in the record;

> --whether the opinion is internally consistent;

> –whether the person giving the medical opinion examined the claimant;

> –whether the person giving the medical opinion treated the claimant;

> –the length of the treating relationship;

> –the frequency of examinations performed;

> –whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

> –the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

> --whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

> –whether any other factors exist to support or contradict the

opinion.

See 20 C.F.R. § 416.927(a)-(f); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House, 500 F.3d at 744 (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 416.927(d)(2). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 416.927(d)(2)(i). "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams, 393 F.3d at 803). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix, 465 F.3d at 888 (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict.  <u>Wagner</u>, 499 F.3d at 849.  Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion.  <u>Wagner</u>, 499 F.3d at 849; <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing <u>Jenkins</u>, 196 F.3d at 925).  However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's RFC determination, such a conclusion may be supported by substantial evidence.  <u>Harvey</u>, 368 F.3d at 1016.

Certain ultimate issues are reserved for the Agency's determination. 20 C.F.R. § 416.927(e).  Any medical opinion on one of these ultimate issues is entitled to no deference because it "invades the province of the Commissioner to make the ultimate disability determination."  <u>House</u>, 500 F.3d at 745 (citing <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1023 (8th Cir. 2002)).  <u>See</u> 20 C.F.R. § 416.927(e)(3).  The ultimate issues reserved to the Agency are as follows:

1.    whether the claimant is disabled;

2.    whether the claimant is able to be gainfully employed;

3.    whether the claimant meets or exceeds any impairment in the Listing of Impairments (appendix 1 to subpart P of part 404 of 20 C.F.R.);

4.    what the claimant's RFC is; and

5.      what the application of vocational factors should be.

<u>See</u> 20 C.F.R. § 416.927(e)(1) and (2); <u>see also</u> <u>Wagner</u>, 499 F.3d at 849 (the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment.") (quoting <u>Qualls v. Apfel</u>, 158 F.3d 425, 428 (8th Cir. 1998)).  The RFC determination is specifically noted to be one of those determinations that are an ultimate issue for the Agency to determine.  20 C.F.R. § 416.927(e)(2); <u>Cox</u>, 495 F.3d at 619-620.

### 2.    Application of the Standard to Dr. Sabow's Opinion

Dr. Sabow issued an opinion in September, 1993, that Ms. Muckler should not be forced to go back to work and was totally disabled.  A.R. 322.  Ms. Muckler argues that the ALJ erred in failing to give controlling weight to this opinion of her treating physician.[13]  The court concludes that the ALJ did not err in failing to give controlling weight to this opinion.

Firstly, the issues of whether Ms. Muckler was "disabled" or capable of being employed are legal conclusions on ultimate issues reserved for the ALJ's determination. <u>See</u> 20 C.F.R. § 416.927(e)(1) and (2); <u>Wagner</u>, 499 F.3d at 849.  Secondly, Dr. Sabow's opinion was not based on any kind of examination or evaluation.  <u>See</u> 20 C.F.R. § 416.927(a)-(f); <u>Wagner</u>, 499 F.3d 848.  A.R. 322.

---

[13]September, 1993, was during a time when Ms. Muckler was admittedly using illegal street drugs, a fact apparently unknown to Dr. Sabow at the time.

64

In addition, Dr. Sabow's opinion reflected his opinion of her condition in September, 1993, not an opinion of her condition as of December, 1990, which was three years earlier.

Finally, even if one interprets Dr. Sabow's record of this September, 1993, office visit to be indicative of his opinion of Ms. Muckler's condition in December, 1990, it is inconsistent with his own more contemporaneous records in which he never expressed these opinions. In fact, just a few months before the September, 1993, record, Dr. Sabow had described Ms. Muckler as 70-80 % improved, looking and feeling better than she had in years, and being better than Dr. Sabow had ever seen her. A.R. 981-982. Furthermore, Dr. Sabow's opinion in September, 1993, is inconsistent with the records of other physicians, psychologists, and physical therapists who all expressed opinions in time frames closer to December, 1990, that Ms. Muckler was capable of, and should, work. See, e.g. A.R. 139-144, 218, 220, 160, 166, 182. See 20 C.F.R. § 416.927(a)-(f); Wagner, 499 F.3d 848. The court recommends affirming the ALJ's decision which failed to give controlling weight to Dr. Sabow's September, 1993, opinion.

### 3.    Application of the Standard to Dr. Anderson's Opinion

Dr. Anderson expressed the opinion in his June 22, 2000, letter that Ms. Muckler was incapable of full-time employment and that her psychological condition was a greater impairment than her physical condition. A.R. 1160.

65

Ms. Muckler argues that the ALJ erred in failing to give controlling weight to this opinion.  The court recommends affirming the ALJ's decision in this respect.

As discussed above, Dr. Anderson's opinion does not state a time frame, so it is impossible to determine if he opined that Ms. Muckler was disabled in December, 1990, or at some other time.  <u>See</u> A.R. 1160.  Also, the opinion is not based upon any examination or evaluation and, although Dr. Anderson had been Ms. Muckler's treating physician, that treating relationship had ended nearly a decade earlier.  <u>See</u> 20 C.F.R. § 416.927(a)-(f); <u>Wagner</u>, 499 F.3d 848.  Also, the prow of Dr. Anderson's opinion is that her psychological condition is the more serious disabling condition, an opinion that lies outside Dr. Anderson's area of expertise.   <u>Dolph v. Barnhart</u>, 308 F.3d 876, 879 (8th Cir. 2002) (when a physician renders an opinion outside the area of his expertise, this is a factor which supports the ALJ's refusal to give controlling weight to the opinion).  In addition, Dr. Anderson rendered this opinion after a review of only part of Ms. Muckler's records, and apparently none of her records from mental health professionals.  <u>See</u> A.R. 1159 (listing records provided to Dr. Anderson).

Finally, and most significantly, Dr. Anderson's June, 2000, opinion is contradicted by his own records, and those of others, created more contemporaneously with the December, 1990, time frame which indicate that

66

Ms. Muckler was capable of working at either the light or sedentary level and that her mental condition was not severe.  <u>See, e.g.</u>  A.R. 139-144, 159-160, 166, 170, 182, 218, 220, 278-280, 312-316, 1279-1291.

**D.      Whether the ALJ Erred in Discrediting Ms. Muckler's Testimony**

Ms. Muckler argues in her brief that the ALJ erred in discrediting Ms. Muckler's testimony.  In determining whether to fully credit a claimant's subjective complaints of disabling pain, an ALJ must consider several factors, including:  whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional pain medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  <u>Wagner</u>, 499 F.3d at 851 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)).  A claimant's subjective complaints of pain may be discredited only if they are inconsistent with the evidence as a whole.  <u>Id.</u>

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency,

appropriateness, and independence of the activities." Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original). Although activities which are inconsistent with a claimant's testimony of disabling pain reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

In the Wagner case, the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where Wagner had engaged in extensive daily activities, as evidenced by his "Daily Activities Questionnaire" and his testimony at the hearing, and where his testimony as to the limiting effect of his pain was inconsistent with the medical record because his records reflected that he did not pursue ongoing evaluation or treatment for his pain and he did not seek or take pain medication on a regular basis. Wagner, 499 F.3d at 852-853. See also Baker, 457 F.3d at 892-894 (affirming ALJ's discrediting of claimant's subjective complaints of pain where claimant engaged in a significant amount of activities of daily living–full self-care, driving a car, shopping, and running errands–a medical source opined that the claimant

engaged in symptom exaggeration, the claimant did not take pain medication, and the absence of an etiology for the alleged pain).

In Patrick v. Barnhart, 323 F.3d 592 (8th Cir. 2003), the claimant alleged Graves disease as a disabling condition and testified at the hearing before the ALJ that she mostly reclined all day with her feet up and watched television and talked to her neighbors.  Id. at 594-595.  The ALJ discounted Patrick's allegation that she needed to recline and keep her feet up all day because there was no objective medical record that supported the allegation.  Id. at 595.  Instead, Patrick's treating physician opined that Patrick might need to lie down for 30 minutes in an 8-hour work day and that it would be helpful to prop her legs up one to three times per day.  Id.  Patrick's physician opined that Patrick could engage in sedentary work, and the ALJ adopted this conclusion in his written opinion denying benefits.  Id.  Because the ALJ's findings were consistent with the limitations articulated by Patrick's own treating physicians, the Eighth Circuit affirmed the ALJ's discounting of Patrick's testimony as to her need to recline most of the day.  Id. at 595-596.

In Blakeman v. Astrue, 509 F.3d 878 (8th Cir. 2007), the claimant, who suffered a congenital heart condition, had testified at the hearing before the ALJ that he napped one to two hours each afternoon.  Id. at 882.  In determining Blakeman's RFC, the ALJ discounted this testimony concerning naps.  Id. at 882-883.  The Eighth Circuit affirmed because the medical

evidence in the record, including Blakeman's treating physician, did not support a limitation on Blakeman's functioning as testified to by Blakeman. Id. The Eighth Circuit stated that the issue was not whether Blakeman in fact did nap every day, a fact not contested, but rather, whether Blakeman's disability compelled him to nap each afternoon. Id.

Here, in several documents created by her caregivers in and around December, 1990, they recorded levels of exertion much greater than what Ms. Muckler testified to at the hearings. Most of the information in these records are recorded statements from Ms. Muckler herself. In September, 1988, Ms. Muckler was exercising at home, riding a stationary bicycle, using a Theraban, and using arm weights. A.R. 219. In April, 1989, Ms. Muckler was able to walk for 30 minutes without pain, engage in aqua therapy without pain, take care of her self in all respects, perform household chores, perform some yard work, and exercise daily including riding a bike. A.R. 163-166, 179-181. In September, 1989, Ms. Muckler reported doing housework, caring for three dogs which included daily walking, and going out for entertainment, including a night of dancing. A.R. 183-184. In March, 1990, she was exercising on a daily basis at home and riding an exercise bicycle. A.R. 222. In October, 1990, she had obtained a mountain bicycle and was riding it regularly. A.R. 223. In May, 1991, Ms. Muckler reported that she was responsible for all household maintenance, took care of her dogs including walking them one-half

to one full mile per day, performed some yard work, had recently done spring cleaning, did physical therapy exercises with two-pound hand weights, and rode her exercise bike five to ten miles *daily*, which involved 15 to 45 minutes of exertion.  A.R. 312, 315.

These statements that Ms. Muckler herself made to her care givers and evaluators contradict starkly her testimony before the ALJs that she could only bicycle for five to ten minutes at a time, two to three times a week.  A.R. 64-65 (compare with 15 to 45 minutes per day, A.R. 312).  Or that she could only walk for three to four minutes at a time.  A.R. 54, 56-57 (compare with walk 30 minutes without pain, A.R. 163-166, 181, and walk one-half to one full mile, A.R. 312).  Or that she was unable to push or pull with her left hand.  A.R. 1364-1365 (compare with using her left hand to vacuum, dress, and do dishes, A.R. 287-290).  Ms. Muckler's testimony before the ALJs that she spent most of the day lying down due to her pain is simply not credible given the level and types of activities documents out of Ms. Muckler's own mouth in her medical records.  <u>Compare</u> A.R. 55 (most of the day lying down), <u>with</u> A.R. 163-166, 181, 222, 219, 223, 285, 287-290, 312, 315 (much activity on a regular and sustained basis).  Even Ms. Muckler's own testimony at the hearing contradicted her assessment of her RFC in that she testified that she cares for a two-year-old foster child, for whom she is solely responsible during her husband's frequent, employment-related absences.  A.R. 42-43, 70-71.

Sedentary work is defined by the agency as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Haley v. Massanari, 258 F.3d 742, 749 n.7 (8th Cir. 2001) (quoting 20 C.F.R. § 404.1567(a)).

Ms. Muckler's own testimony as to her daily activities, as recorded in her medical records, certainly fits this definition of sedentary. Furthermore, her statements as recorded in these records reflect that her activity has been on a sustained and regular basis over the course of several years, both before and after December, 1990. Her activities as recorded in her medical records from her own statements to her care givers simply do not mesh with her stated testimony at the hearings before the ALJs. ALJ Donovan was justified in discrediting Ms. Muckler's testimony as to her RFC because no where in the medical record is there support for her alleged limitations. Blakeman, 509 F.3d at 882-883; Patrick, 323 F.3d at 595-596.

## CONCLUSION

The court recommends that the decision of the agency denying benefits to Linda Muckler be affirmed in all respects.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require *de novo* review by the district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated April 15, 2009.

BY THE COURT:

*/s/ Veronica L. Duffy*
VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE